UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL BATES and BRENDA BATES, individually and as parents and natural guardians of C.B.,<br>　　　　　　　　Plaintiffs,<br>　v.<br><br>3B DETENTION CENTER, BONNEVILLE COUNTY, BINGHAM COUNTY, BUTTE COUNTY, and JOHN DOES I-X,<br>　　　　　　　　Defendants. | Case No.  4:14-cv-359-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it defendants' motion for summary judgment.  The Court heard oral argument on the motion, took the motion under advisement, and directed counsel to file further briefing.  Those briefs have now been received and the motion is at issue.  For the reasons explained below, the Court will grant the motion in part, dismissing all claims except the claim that defendants violated the juvenile's constitutional right to medical treatment for pain.

## FACTUAL BACKGROUND

In 1996, the three defendant counties – Bonneville, Bingham, and Butte – entered into an agreement to construct and operate a juvenile detention facility to be known as the 3B Detention Center.  The three counties each had an ownership interest in the Center.  They selected a Board to develop policies and hired a Director to staff the Center and train the employees.

**Memorandum Decision & Order – page 1**

On March 18, 2014, juvenile C.B. Bates was booked into the Center for violating the terms of her probation.  She was being treated for depression, mood swings, bi-polar disorder, anxiety, and several suicide attempts, and was taking the prescription drug Trazadone, among other medications.  C.B.'s mother, Brenda Bates, states that she delivered the Trazadone to the Center, "spoke to a woman at the front desk [the intake officer]," and told her that "based on what the doctor had told me that C.B. needed to take her medications with food."  *See Brenda Bates Declaration (Dkt. No. 26-13)* at ¶ 4.

But the intake officer failed to note on the Medical Disbursement Log that the Trazadone should be taken with food.  Consequently, the officer who dispensed the Trazadone to C.B. did not have her take the pill with food.

As a result of taking the Trazadone on an empty stomach, C.B. because dizzy during the evening.  *See Dr. Denny Report (Dkt. No. 26-7).*  She lost her balance, fell, and hit her face on the concrete floor.

In the fall, she broke her jaw and several teeth, opened a gash on her chin, and was in "excruciating pain."  *See C.B. Declaration (Dkt. No. 26-11)* at ¶ 8, 14.  Officer Britany Wright found her on the floor of her cell at 11:11 p.m. on March 18, 2014.  *See Wright Statement (Dkt. No. 26-9); Statement of Facts (Dkt. No. 26-1)* at ¶ 24.

Officer Wright obtained assistance from Officer Havens, and they walked C.B. to some stairs where they had her sit down while Officer Havens left to call Director Walker.  At this time Officer Byington also assisted.  He said that C.B. appeared to be in "a lot of pain."  *Byington Statement (Dkt. No. 26-9).*  Officer Wright concurred that C.B. "was in a lot of pain."  *See Wright Statement, supra.*

**Memorandum Decision & Order – page 2**

The Detention Center had a policy that if an inmate's condition is "life-threatening," the staff shall immediately contact the paramedics to transport the inmate to the hospital in an ambulance. *See Emergency Procedure Manual (Dkt. No. 26-9)* at p. 3B-160. If her condition is not life-threatening, the policy requires that the staff to "[n]otify [the] Director first" to determine if the inmate needs to be transported for treatment by some non-emergency means or does not need to be transported for treatment at all. *Id.*

The Detention Center has no medical staff of its own. *See Flagel Deposition (Dkt. No. 26-4)* at p. 116. Instead, the Detention Center officers have access to medical personnel at the Bonneville County Jail, adjacent to the Detention Center. *Id.* The Detention Center staff "are authorized to call the medical staff [at the Bonneville County Jail] or the Paramedics for medical assistance when a Medical Emergency exists." *See Emergency Procedure Manual, supra,* at p. 3B 160. But there is no requirement that a Detention Center officer call the medical staff before making a decision whether an inmate is suffering from a "life threatening" injury. The officers have no medical training beyond basic first aid and CPR procedures. *See Havens Deposition (Dkt. No. 26-3)* at pp. 59-60. Moreover, they are not trained on what constitutes a life threatening emergency. *Id.* at p. 60.

Following these policies, Officer Havens did not call the medical staff at the Bonneville County Jail but instead made the decision himself that C.B.'s condition was not "life threatening" and thus did not immediately call for an ambulance. *Id.* at p. 58. Pursuant to policy, he telephoned Director Walker to determine whether C.B. needed to

**Memorandum Decision & Order – page 3**

be transported by some non-emergency means (other than by ambulance with paramedics) for treatment. In that call, Officer Havens described C.B.'s condition as follows:

> I told him [Director Walker] that she had fallen and that she had blood in her mouth and that she was woozy and was having trouble standing. And that's all I knew of her condition, just from what I had seen.

*See Havens Deposition, supra* at p. 58. Absent from this description is any reference to the pain suffered by C.B. that was observed by both Officers Wright and Byington, as discussed above. Thus, there is at least a question of fact as to whether Officer Haven even considered the substantial pain suffered by C.B. in evaluating his options for treating C.B.

Based on this telephone call, Director Walker determined that C.B. should be transported by non-emergency means for treatment. *Id.* at 56, 58-61*; see also, Walker Declaration (Dkt. No. 24-8)* at ¶ 5. Officer Havens called C.B.'s parents to have them take C.B. to the hospital, and then returned to C.B. sitting on the stairs about 11:22 p.m. *See Plaintiffs' Statement of Facts, supra* at ¶ 22. It took Daniel Bates, C.B.'s father, about 5 minutes to get from his house to the Detention Center. *See Bates Deposition (Dkt. No. 24-4)* at p. 25. He arrived at 11:35 p.m. and transported her to the hospital. *See Plaintiffs' Statement of Facts, supra* at ¶ 22. He says that it took him about 15 minutes to drive the 5 miles to the hospital because he returned home to pick up his wife. Assuming he left the Detention Center about 11:40 pm, he arrived at the hospital about 11:55 pm. Thus, from the time C.B. was found on the floor of her cell (11:11 p.m.) to the time she

**Memorandum Decision & Order – page 4**

arrived at the hospital (11:55 pm), roughly 45 minutes elapsed, at least under the facts contained in the record before the Court.

At the hospital, C.B. "learned that I had broken my jaw in three places; and I had broken several teeth; I had a cut on my chin that required stitches; and I had surgery on my jaw. *See C.B. Declaration, supra,* at ¶ 14. She will need "additional dental work to repair my teeth." *Id.* at ¶ 15.

To recover damages for her injuries, C.B.'s parents Daniel and Brenda Bates have sued the 3B Detention Center and the three counties that own the Center: (1) Butte County; (2) Bonneville County; and (3) Bingham County. The Bates have brought state law claims against these defendants as well as a claim under §1983 for a violation of her constitutional rights. The Bates bring this suit in their individual capacity, and as parents and guardians for their juvenile daughter C.B. The defendants have responded with a motion for summary judgment seeking to dismiss all claims.[1]

## LEGAL STANDARDS

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between

---

[1] The three defendant counties argue that they have delegated their duties to the Detention Center Board and Director and have no involvement in the Center's operation. But a governmental entity may not delegate away its constitutional obligations. *See Terry v Adams,* 345 U.S. 461 (1953). The Court therefore rejects this argument.

**Memorandum Decision & Order – page 5**

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id*. at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

## ANALYSIS

### State Law Claims

The Bates' state law claims are governed by the Idaho Tort Claims Act (ITCA). *See Sherer v. Pocatello School Dist. No. 25,* 148 P.3d 1232 (Id.Sup.Ct. 2006). The Bates has the burden of showing that "no exception to liability under the ITCA shields the alleged misconduct from liability." *Id.* at 1236.

The ITCA creates an exception to liability for a governmental entity that is sued for acts arising out of its medical care for those in its custody. Specifically, Idaho Code §6-904B states in pertinent part as follows:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without gross negligence or reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which:
> . . . .
>> 5. Arises out of any act or omission providing or failing to provide medical care to a prisoner or person in the custody of any city, county or state jail, detention center or correctional facility.

While the Idaho Supreme Court has not had an opportunity to address the meaning of this particular statute, it did interpret almost identical prefatory language in Idaho Code § 6-904(3). That language reads as follows: "A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of assault, battery . . . or interference with contract rights." The Idaho Supreme Court held that "[t]he plain language of the first clause of that section exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Id.Sup.Ct. 2011). The result of

this interpretation is that Idaho governmental entities had complete immunity for the listed torts even if committed with malice or criminal intent.

The first clause of § 6-904B is worded essentially the same, merely adding "gross negligence or reckless willful and wanton conduct" to the list of exclusions from the exception. The Idaho law on statutory interpretation holds that "portions of the same act or section may be resorted to as an aid to determine the sense in which a word, phrase, or clause is used, and such phrase, word, or clause, repeatedly used in a statute, will be presumed to bear the same meaning throughout the statute . . . ." *St. Luke's Magic Valley Reg. Med. Ctr. v. Bd. of Cty. Comm.* 149 Idaho 584, 589 (2010). Thus, one phrase in the Idaho Torts Claim Act that is repeated throughout the Act will be presumed to bear the same meaning throughout. Applying this standard to § 6-904B, the Court finds that if the Idaho Supreme Court was confronted with the language of § 6-904B, it would apply *Hoffer* and hold that an Idaho governmental entity shall not be liable for a claim arising out of "any act or omission providing or failing to provide medical care to a . . . person in the custody of any . . . county . . . detention center . . . ." *See* I.C. § 6-904B.

The plaintiff's state law claims all arise out of defendants' acts in either providing or failing to provide medical care to a person in custody at the 3B Detention Center. Consequently, the defendants – all governmental entities – have complete immunity from these state law claims.

### *Monell* Claim

The Bates seek to impose liability on the defendants under 42 U.S.C. § 1983. The Supreme Court requires a plaintiff seeking to impose liability on a municipality under §

**Memorandum Decision & Order – page 8**

1983 to identify a municipal policy or custom that deprived the plaintiffs of a constitutional right. *Monell v. Dep't of Soc. Servs. Of City of New York,* 436 U.S. 658, 694 (1978). To prove that the policy or custom caused the deprivation, the plaintiff must prove that "it is so closely related as to be the moving force causing the ultimate injury." *Oviatt v Pearce,* 954 F.2d 1470, 1481 (9th Cir. 2000).

### *Monell* Claim – Policy Regarding Medical Disbursement Log

The Bates allege that the defendants had a policy or custom of failing to train its officers how to fill out the medical disbursement log. But the only evidence in the record is that the defendants did provide specific training on this point. *See Flagel Deposition (Dkt. No. 26-4)* at pp. 51-57 (describing Detention Center policy on how to fill out log); *Havens Deposition (Dkt. No. 26-3)* at pp. 16-17 (describing training he received at the Detention Center on how to fill out the log); *see also Havens Declaration (Dkt. No. 24-12)* at ¶ 2 (stating that his training at the Peace Officers Standards and Training Academy ("POST") included a "POST-accredited class for disbursement of medications").

Getting more specific, the Bates allege that it was the policy of defendants not to transfer specific warnings – such as that the medication must be taken with food – from the pill bottle onto the medication disbursement logs. But they fail to submit any evidence of such a policy. Indeed, the record shows just the opposite: If the medication came with a warning that it be taken with food, the Detention Center policy required that the warning be followed. *See Walker Declaration (Dkt. 24-8)* at ¶ 6; *Havens Declaration (Dkt. No. 24-12)* at ¶ 4; *Flagel Declaration (Dkt. No. 24-11)* at ¶ 8.

**Memorandum Decision & Order – page 9**

The Bates respond that even if the failure to transfer warnings from the pill bottle to the log was not a policy, it was a custom in the Detention Center. To be actionable, the custom must be so "persistent and widespread" that it constitutes a "permanent and well-settled [municipal] policy." *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). Liability for improper custom "may not be predicated on isolated or sporadic incidents." *Hunter v. County of Sacramento,* 652 F.3d 1225, 1233 (9th Cir. 2011).

Bates submitted evidence from medical disbursement logs that for another inmate on December 27, 2010, the log failed to note that Trazodone should be taken with food. *See Log (Dkt. No. 26-9)* at p. 3B-4. In addition, the log for C.B. on the date of this incident – March 18, 2014 – also failed to note that Trazodone should be taken with food. *Id.* at p. 3B-111. This error was repeated on a later log for August 19, 2014, *id.* at p. 3B-232. and August 21, 2014, *id.* at p. 3B-233 to -235. There is no other evidence of a failure to note that Trazodone – or any other drug that was required to be taken with food – should be taken with food.

With this record, Bates has identified 4 incidents over 44 months where intake officers failed to note on the logs that Trazodone should be taken with food. Even assuming that in each incident the Trazodone pill bottle stated that the drug must be taken with food, 4 incidents in 44 months can only be described as "sporadic," and cannot be described as "so persistent and widespread that it constitutes a permanent and well-settled policy." *Monell,* 436 U.S. at 691.

The Detention Center staff were likely negligent in failing to adhere to policy and provide food when administering the Trazodone to C.B. But the negligence of the staff is

**Memorandum Decision & Order – page 10**

not sufficient to tag the defendants with liability under *Monell*. *See Dougherty v. City of Covina,* 654 F.3d 892, 901–02 (9th Cir.2011) (mere negligence in training or supervision does not give rise to a *Monell* claim). The Bates must show that some policy or custom of the Detention Center was the cause of C.B.'s injury. *Id.* Here, the record can only be interpreted in one way: The policy of the Detention Center required that food be administered according to instructions printed on the pill bottle label. And there is no sufficient evidence of a pervasive custom of failing to adhere to instructions on pill bottles.

For these reasons, the claim that defendants' had a policy or custom of failing to train staff on how to fill out logs or on how to administer food with drugs when required, must be dismissed.

### *Monell* Claim – Policy Regarding Transport & Medical Treatment

The Bates argue that the Director – who has no medical training – erred in refusing to have C.B. transported by the paramedics in an ambulance to the hospital. If medical staff were available, the Bates assert, an ambulance would have been called immediately, which would have, according to C.B. "decrease[d] the risk of complications and decrease[d] the duration of my pain." *See C.B. Declaration (Dkt. No. 26-11)* at ¶ 15.

But when Daniel Bates was asked at his deposition how his daughter's injuries were affected by any delay in getting her to the hospital, he answered "I don't know." *See Daniel Bates Deposition (Dkt. No. 24-4)* at p. 37. Brenda Bates was likewise unable to specify any complications caused by the delay in transport. *See Brenda Bates Deposition (Dkt. No. 24-5)* at pp 42-43. The Bates have not submitted any evidence that

**Memorandum Decision & Order – page 11**

the delay in getting her to the hospital caused "complications" or affected her injuries in any way.

The Bates argue that even if the transport delay did not cause complications, it did delay C.B. from getting pain relief. There are facts supporting that allegation. From the rough time estimates discussed above, it took about 45 minutes for C.B. to get to the hospital, and then some additional time for the hospital staff to administer pain medication. Making all inferences in her favor, C.B. had to wait at least an hour (and perhaps longer) from the time she was found on her cell floor until the time she obtained some pain relief in the hospital. On the other hand, if Officer Havens had immediately called the medical staff at the Bonneville County Jail, they could have administered pain medications to C.B within minutes because they were right next door.[2]

There are at least questions of fact as to whether the Detention Center policies were the "moving force" causing the delay in getting pain relief to C.B. for three reasons: (1) The policies authorized Officer Havens rather than someone with medical training to determine if C.B. was suffering from a "life threatening" injury; (2) The policies did not require or establish any training to teach staff how to determine whether an injury was life threatening; and (3) the policies did not define the term "life-threatening" and, more

---

[2] The Court is making key inferences in C.B.'s favor, as required by the summary judgment standards set forth above. The Court infers from the evidence that (1) C.B.'s pain was substantial and continued at least until the time she arrived at the hospital; (2) the medical staff at the Bonneville County Jail were authorized to administer pain medications, *see Rules of the Idaho Board of Nursing* § 280.02d (allowing an advance practice registered nurse to prescribe and dispense pain meds); and (3) the medical staff were available at that time and had immediate access to pain medications that would have relieved C.B.'s pain quickly.

**Memorandum Decision & Order – page 12**

specifically, said nothing about evaluating pain in determining whether medical staff should be contacted.

To summarize, there are at least genuine issues of fact as to whether Officer Haven's adherence to this policy extended the time C.B. suffered with pain. But genuine issues of fact by themselves are meaningless – the real issue is whether these genuine issues of fact are material. And they are material only if C.B. has a constitutional right to medical treatment for substantial pain.

The Eighth Amendment requires that the Government provide medical care for convicted prisoners, and in providing that care, not be deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* An accident or inadvertent failure to provide adequate medical care is not sufficient; the defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v Smith,* 974 F.2d 1050, 1060 (9th Cir. 1992) (overruled on other grounds by *WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997)).

But a more protective standard is applied to pretrial detainees and patients involuntarily committed to state mental health facilities. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979) (pretrial detainees); *Youngberg v. Romeo*, 457 U.S. 307, 310, (1982) (involuntary mental health commitments). Describing the reasoning behind this greater protection, the Supreme Court explained that "[t]he combination of a patient's

**Memorandum Decision & Order – page 13**

involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *County of Sacramento v. Lewis*, 523 U.S. 833, 852 n. 12 (1998).

Juveniles in the Detention Center are likewise committed involuntarily and totally dependent on their custodians. *See Gary H. v. Hegstrom,* 831 F.2d 1430 (9th Cir. 1987) (applying more protective standard to juveniles under Oregon's juvenile justice system). In this case, C.B. did not enter a formal plea of guilty but was committed by her probation officer who determined that she had violated the terms of her probation. *See Notice (Dkt. No. 24-10); Idaho Code* § 20-501. Thus, she is not a convicted prisoner and her constitutional rights do not derive from the Eighth Amendment but rather from the more protective provisions of the due process clause of the Fourteenth Amendment: "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Ammons v. Washington Dept. of Social & Health Services,* 648 F.3d 1020, 1027 (9th Cir. 2011) (quoting *Youngberg,* 457 U.S. at 321-22).

It is consistent with this more protective standard to hold that C.B. has a constitutional right to medical treatment for substantial pain. Of course, defendants did eventually authorize C.B. to receive treatment so the real issue is whether the delay in receiving treatment violated her constitutional rights. Delay in access to treatment that results in the "unnecessary and wanton infliction of pain" can violate the Eighth Amendment. *Estelle,* 429 U.S. at 104-05. Given the more protective standard to be

**Memorandum Decision & Order – page 14**

applied here, a delay in treating a juvenile's substantial pain might violate her constitutional right to treatment for that pain, depending on the circumstances.

Here there are genuine issues of material fact that preclude a summary judgment on this issue. C.B. testified that she was in "excruciating pain." *See C.B. Declaration (Dkt. No. 26-11)* at ¶ 8, 14. Officer Wright and Officer Byington both observed that C.B. was in "a lot of pain." Yet Officer Haven may not have considered her pain in determining the options available to him – in describing her condition to Director Walker, Officer Haven did not mention C.B.'s pain. The Detention Center policies may have caused delay because they did not expressly account for pain and allowed non-medical staff to make medical decisions. There was at least a delay of one hour in getting pain relief for C.B. All of these factors combine to create genuine issues of material fact that preclude summary judgment.

## Conclusion

In conclusion, the Court will grant summary judgment on all claims except the *Monell* claim under § 1983 that defendants' policies violated C.B.'s constitutional right to medical treatment for substantial pain due to the delay in that treatment.

### ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendants' motion for summary judgment (docket no. 24) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to dismiss all state law claims and all claims under § 1983 that defendants' policies and/or customs led to the staff's failure to provide food with

C.B.'s medication. The motion is denied as to the *Monell* claim under § 1983 that defendants' policies violated C.B.'s constitutional right to medical treatment for substantial pain.

IT IS FURTHER ORDERED, that the parties shall immediately contact the Court's Clerk Jamie Bracke (208-334-9021 or jamie_bracke@id.uscourts.gov) to schedule a conference where a trial date can be set.

DATED: March 11, 2016

_____
B. Lynn Winmill
Chief Judge
United States District Court